```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3    UNITED STATES OF AMERICA,)
           Plaintiff ,        )
 4                            )
           vs.                )   CASE NUMBER: GLR 20-0283
 5                            )
      GARY ROCKY JONES,        )        Motions Hearing
 6         Defendant.          )
      _____)
 7
                    - TRANSCRIPT OF PROCEEDINGS -
 8              CONTINUATION OF MOTIONS HEARING
          BEFORE THE HONORABLE GEORGE LEVI RUSSELL, III
 9                UNITED STATES DISTRICT JUDGE
                  Thursday, September 7, 2023
10                   BALTIMORE, MARYLAND


11                    A P P E A R A N C E S

12    FOR THE PLAINTIFF:
13         BY: PAUL BUDLOW, ESQUIRE
               COLLEEN McGUINN, ESQUIRE
14              OFFICE OF THE UNITED STATES ATTORNEY
                36 S. Charles Street, 4th Floor
15              Baltimore, Maryland  21201

16    FOR THE DEFENDANT:
           BY: COURTNEY FRANCIK, ESQUIRE
17         BY: KATHERINE NEWBERGER, ESQUIRE
               OFFICE OF THE FEDERAL PUBLIC DEFENDER
18              100 S. Charles Street, Tower II, 9th Floor
                Baltimore, Maryland  21201
19
      Also Present:
20
      Special Agent Rachel Corn, FBI
21
22    _____
23

24

25
```

```
 1                    P R O C E E D I N G S
 2        (3:05 p.m.)
 3               MR. BUDLOW:  Good afternoon, Your Honor.  This is
 4        United States of America v. Gary Rocky Jones. Criminal Number
 5        GLR 20-0283. We're scheduled before Your Honor this afternoon
 6        for a continuation of the pretrial conference and motions in
 7        limine hearing. I'm Paul Budlow on behalf of the Government.
 8        With me at counsel table is Assistant United States Attorney
 9        Colleen McGuinn and behind us is Special Agent Rachel Corn.
10               THE COURT:  Okay, very well.  All right, good
11        afternoon to everyone. Everyone could be seated.
12          Counsel, why don't you introduce yourselves.
13               MS. FRANCIK:  Good afternoon, Your Honor.  Courtney
14        Francik on behalf of Gary Jones who is standing to my left and
15        I'm joined here by my colleague, Katherine Tang Newberger from
16        the Office of the Federal Public Defender.
17               THE COURT:  Okay, very well. All right, good
18        afternoon to everyone. We are here for the purposes of a
19        continuation of the motions hearing. At the previous hearing
20        the Court indicated just because of the timing of it, it
21        didn't have the opportunity to review the supplemental
22        correspondence and filings that were made by the Government. I
23        have had the opportunity to review that correspondence. I've
24        had the opportunity to also review the responses. I note that
25        it's sort of almost like cross motions. There's a motion in
```

 1    limine by the Government and then there's another motion to

 2    exclude cumulative, unfair, prejudicial evidence which appears

 3    to be overlapping some of the evidence that the Government is

 4    seeking to admit.

 5        So I guess we can go in the order of filing. There was an

 6    initial motion to admit that was filed on September 21, 2022

 7    by the Government, but then, of course, there was a motion by

 8    the defense counsel on October 8, 2023. I defer to everyone as

 9    to which ones you want to handle first. I note that there was

10    some discussion at the conclusion of yesterday's proceedings,

11    there was indications from -- there was some indication from

12    Mr. Budlow and I think Ms. Francik as well that there were

13    some discussions regarding some of the matters that were the

14    subject of these motions. So why don't you let me know where

15    we are and how I can help and let me issue some rulings.

16        **MR. BUDLOW:**  Your Honor, I'd be happy to take a shot

17    at that, Your Honor. Thank you. I do believe that both because

18    of the filings and since the filings the parties have had an

19    opportunity to have a little bit more concrete discussions

20    about the actual files that the Government would be producing

21    and we've reached a number of agreements which have included

22    the Government scaling back quite a bit and I believe the

23    defense withdrawing certain objections after discussions.

24        I think that what is primarily on the table for the Court

25    today are two areas of admissibility. One is the admissibility

1   of the defendant's prior convictions which as the Court

2   summarized, the Government filed a motion to admit, the

3   defense filed a response, and the Government filed an addendum

4   that was also a reply.

5        The second issue also contained in the same filings is

6   the Government's motion to admit Facebook chats between the

7   defendant's Facebook account and two other individuals. Again,

8   that was addressed in the Government's -- very briefly in the

9   Government's initial filing and the defendant's response, and

10  then the Government's addendum/reply.

11       There are a number of other issues that are addressed in

12  the pleadings and I believe that the parties agree that the

13  vast majority of them have been resolved and that to the

14  extent that there's a few straggling matters, we think that it

15  doesn't necessarily make sense to take up the Court's time

16  today because we are still discussing ways to reach agreement.

17            **THE COURT:**  Okay. Right, that seems to make sense,

18  plus there may be an understanding as the case proceeds during

19  the course of the trial on the flow of evidence, a

20  determination on whether or not it's either the evidence is

21  not necessary or whether or not there's -- there won't be an

22  objection in the first place.  And there could be adjustments

23  just based upon the impact of the evidence that the parties

24  may not have an appreciation for until you go live. So, all

25  right.

```
 1        Well, I've already made certain rulings that the prior

 2   conviction, that his prior second degree sex offense does

 3   constitute a prior conviction for the purposes of the

 4   enhancement. So I guess there's an argument as to the

 5   admissibility of the prior conviction in the Government's case

 6   in chief either under 414 or under 404(b).

 7        MR. BUDLOW:  Yes, Your Honor. And I'm happy to

 8   address that now. Would you like me to move from that argument

 9   into Facebook or would you like me to keep them as separate

10   discussions?

11        THE COURT:  I would defer to you. I sort of know

12   that you laid out and also defense counsel concurred in laying

13   out the framework in which you're going to be operating. I've

14   looked at the rule as well, so I think I'm fairly caught up to

15   speed on the law. Just whatever is the most -- whatever you

16   think is the most efficient.

17        MR. BUDLOW:  I'll go if the defense is okay with

18   that, I think that makes sense.  I think the arguments, mine

19   at least will be similar.

20        THE COURT:  Right.

21        MR. BUDLOW:  I appreciate Your Honor has read the

22   materials and talked about the law. I do just want to discuss

23   very briefly the law if I can find my notes.

24        So Your Honor, I practiced for the longest time, it seems

25   like a long time ago, in state court. I know Your Honor was a
```

 1      Circuit Court judge there as well. And there is no 414 there.

 2      And so at first glance of 414 when you see prior convictions

 3      come in, in the same kind of case, it's different from what I

 4      practiced at least in Maryland. And then when you read further

 5      and see that *Kelly* case and the Fourth Circuit says not only

 6      does the prior conviction come in, but it comes in as

 7      propensity evidence which is something that maybe we sort of

 8      cowered from in law school a little bit because it wasn't

 9      something that's typical.

10              **THE COURT:**  Congress wants to prosecute these cases

11      and wants to arm the prosecution of these cases with as much

12      evidence as possible, I guess.

13              **MR. BUDLOW:**  I agree.  And I'd go further.  I'd say

14      that the idea that propensity evidence doesn't come in in a

15      lot of situations while it might make sense in some way, also

16      defies logic in a lot of ways. Like the first thing that most

17      people say when they hear about a bad act or a bad actor they

18      say well, has this person done that before.  And there's a

19      reason everybody says that.  So Congress has recognized in

20      this case we're going to let that sort of inherent logic play

21      out.

22          And so as a result, what they did was as Your Honor

23      knows, they passed Rule 414. And Rule 414 very simply says

24      that if the defendant is accused of child molestation and the

25      evidence proffered by the Government is of the defendant

1  committing other child molestation clearly prior to the trial,

2  and that evidence is relevant, the Court may admit it. Not the

3  Court must admit it, the Court still has the discretion.

4           **THE COURT:**  Right.

5           **MR. BUDLOW:**  But then when you look further at the

6  factors set forth in *Kelly* and in the other Fourth Circuit

7  cases, they all squarely set forth facts that would make the

8  evidence admissible in this case, which I will get to.

9      But so first the defendant, I don't believe there's any

10  issue, is accused in this trial of child molestation. Any

11  violation of Chapter 110 is child molestation.  Counts One

12  through Twenty-Seven are production of child pornography.

13  They're all violations of Chapter 110.

14      Then the second question which was raised in the

15  briefings a little bit is whether or not the evidence is of

16  another child molestation offense by the defendant. The two

17  purported -- the two individuals in Facebook that the

18  defendant was communicating with, one was 17, one was 13. So

19  there's one that's over 14, so it's relevant here. As to the

20  victims of the prior convictions, they're all under age 14.

21      What I want to make the Court sort of aware of is that

22  the case law is clear that the interpretation of the rule says

23  that if the prior offense, the prior child molestation relates

24  to a violation of Chapter 110, then that is child molestation

25  regardless of the age of the victim.  And that's true of the

1    charged offense as well. So the fact that the victim in the

2    prior offense is maybe in the one circumstance 14 to 17 is of

3    no moment.

4            **THE COURT:**  Right. In fact, the definitions in the

5    chapter at 2256 indicate that a minor is a person under the

6    age of 18 and there's an exception.  And it would be a

7    violation of chapter 110 the fact that the defendant is

8    charged with violation of Chapter -- of several provisions of

9    Chapter 110.

10           **MR. BUDLOW:**  Right. And so then the next question is

11   whether or not the evidence proffered by the Government and

12   here the two instances of prior convictions and the two

13   Facebook chats is relevant. And if they're relevant, then the

14   Court may admit them. And obviously the defense is arguing and

15   will argue today that under 403 which still applies, the Court

16   has the discretion to exclude evidence if it determines that

17   it is -- that its probative value is substantially outweighed

18   by its risk of unfair prejudice.  And I don't think we get

19   close to 403 here, but to the extent we look at it because we

20   should, we should look at two words, "substantially

21   outweighed" and "unfair prejudice." Most importantly, "unfair

22   prejudice."  Because there is nothing that the defense can

23   point to in the proffered evidence by the Government that is

24   unfairly prejudicial, that is different in character from the

25   charged offenses. And, in fact, the cases talk about -- the

1    cases under 414 talk about how when evaluating 403 balancing

2    in a child exploitation scenario, we're always dealing with

3    cases that have a high deal of prejudice, arguably

4    inflammatory. And so it's generally equal when you have the

5    prior molestation and the current molestation.

6         But that's not the case here. The case here is that the

7    facts that are going to be presented at this trial are far

8    more serious than these Facebook chats. And so it's really the

9    opposite. It's not more prejudicial the prior conviction, but

10   in fact the conduct that the jury has to hear in this case is

11   more disturbing or inflammatory.  And not that I think that

12   the evidence is in this case as the Court will see the

13   Government will present it in as narrow a way as possible, but

14   compared to these prior instances is far more serious. The

15   instances to Facebook is an attempted production or attempted

16   coercion and enticement and the incidents in 2004 and 2005 are

17   very similar, but not as serious as say the defendant causing

18   one 17-year-old to engage in sex acts with his 11-year-old

19   brother, things like that.  These are weird balancing and

20   comparative analysis, but the point is it's certainly not

21   substantially outweighing and there's certainly no unfair

22   prejudice because the type of conduct is so similar.

23        And the cases make it clear that the evidence in a 414

24   analysis of prior child molestation is presumptively

25   admissible. In other words, everything that the defense is

1     pointing to as to well, this is child molestation and it's
2     very difficult for jurors to hear and it has an emotional
3     response, the cases have said well, Congress was aware of all
4     of that.  And so this situation that we're presenting where we
5     have a prior molestation in a case of child molestation, we're
6     assuming that. So you'd have to have something extremely
7     different and extremely more serious than whatever if there's
8     such a thing as a typical child molestation case to counter
9     that presumption of admissibility. And as I mentioned earlier,
10    not only can the defense not show something more significant
11    that would potentially do that, but the weight of the evidence
12    that's going to come in at trial is far more serious.

13        And so I would ask the Court when making an analysis
14    obviously to look at the facts both of the prior conviction
15    and the Facebook chats and to see the truly remarkable
16    similarity between the offenses charged here.

17        Court's indulgence. Starting with the prior convictions,
18    there's two. They both involve adolescent boys both at the
19    sort of adolescent and also pre-adolescent ages. They both
20    involve the defendant exploiting them for his sexual
21    gratification.

22        So as to the prior convictions, obviously the ages of the
23    victims are similar. Their genders are similar. In the prior
24    convictions the defendant offered some sort of compensation to
25    two of the victims as he did many of the cases for which this

1    indictment alleges. He also intimidated or threatened the

2    victims in the first case, similar to the allegations in this

3    case. There's no intervening act. There's no significant

4    period of time where the defendant did not engage in similar

5    conduct. He served some time in jail.

6        He was accused in 2015 of similar conduct, awaited a

7    trial in that case.  It was eventually dismissed. That 2015

8    case is now the subject of this indictment and then the

9    conduct in this case occurred between 2018 and 2020. So there

10   certainly was no period of time in the interim that would help

11   the defendant in any way, so no intervening circumstances.

12       Additionally, the evidence is reliable. The defendant

13   indicates in their brief that it was an Alford plea, but the

14   defendant admitted in the Alford plea that the Government or

15   the state could prove the facts beyond a reasonable doubt. And

16   that makes those facts highly relevant. The defendant was

17   reluctant in the transcript and in the video of his guilty

18   plea to enter that plea, but he was reluctant to go to trial

19   because he knew the evidence was there and he was found guilty

20   after admitting that the Government could produce those facts,

21   produce those victims, and convict beyond a reasonable doubt.

22       Additionally, the Facebook chats are close in time to the

23   charges in the indictment and particularly, they're remarkably

24   similar in its conduct in that he asked them for their age, he

25   immediately goes to a discussion of sexual content or

1    requesting nude photos. He offers one to fly into the U.S. and

2    give him money. The other one he focuses on images or videos

3    that are both sexy and of his buttocks, a theme that is seen

4    regularly in the chats with the victims, really John Doe 1

5    through John Doe 16 in this case.

6        I would point out that the *Kelly* case has found that the

7    evidence tending to show propensity or that proof that the

8    defendant has a sexual predatory propensity is an appropriate

9    relevance for 414 evidence.

10       With that as the guidepost, there's no basis, there's

11   nothing that the defense can point to that would remotely show

12   that the evidence proffered in this case is either unfair in

13   any way or that any risk of that unfair prejudice can

14   substantially outweigh the legitimate probative value of his

15   sexual interest in children.

16       And before I sit down, Your Honor, I would just point

17   back to the chart that I showed Your Honor earlier in the week

18   explaining the Government's burden in this case and the proof

19   and the nature of the evidence, and what is presumed to be the

20   defense in this case which I think regardless of how it's

21   articulated will be, "I'm not the person that controlled that

22   Instagram account" that did all, almost all of the child

23   exploitation in this case. And so a critical fact for the

24   Government to prove to the jury, whether the defense thinks we

25   have good evidence of this in other ways or not.

1      But the critical fact to prove, one of them is that the

2    defendant had motive.  And the motive in this case is that the

3    defendant is sexually interested in children. He's sexually

4    interested in boys.  He's sexually interested in boys

5    particularly that are under 10, that are over 10, and that are

6    teenagers. And the Facebook evidence proves that.  The prior

7    convictions that he admitted the state could prove beyond a

8    reasonable doubt prove that.  And the Government has to prove

9    that he's knowingly possessing these videos in his iCloud

10    account, not just that they're in his account which by the

11    way, the defense isn't stipulating that it's his account.  So

12    we've got to prove it's his account, the items are in there,

13    the files are in there, he knowingly possessed it.  And as to

14    the Instagram account regardless of whose account it was, that

15    he was the one using it and that he was the one doing these

16    things.

17      And then as to John Doe 1, the Government has to prove

18    that the person who is standing behind John Doe 1 in a very

19    graphic video of anal sex is the defendant. And we'll produce

20    evidence that the defendant had access to John Doe 1 at the

21    time that that video was made, that he was a regular member of

22    the family at the time that abuse occurred.

23      So it's critical for the Government to be able to prove

24    that the defendant had a motive to have sex with a 15-year old

25    boy. And the evidence that he was previously convicted in

1      Baltimore City and that he was communicating with similarly

2      aged boys on Facebook is highly probative of that and

3      necessary for the Government's case.

4              **THE COURT:**  What was the sentence -- because there

5      are two occasions of the second degree sexual assault. What

6      were the sentences imposed and do you know the release date of

7      the defendant?  Because of course there's a temporal proximity

8      factor which *Kelly* actually asks me to consider. And I

9      understand that there's a broad range.  The case law has

10     indicated that it could be up to ten years or even --

11             **MR. BUDLOW:**  I think there's some 18 to 20.

12             **THE COURT:**  Some even longer, but I was just

13     wondering --

14             **MR. BUDLOW:**  Sure.

15             **THE COURT:**  --what the sentences were, if you know.

16             **MR. BUDLOW:**  I don't have it with me. My

17     recollection is as to the first case which was a 2004

18     conviction, it was either no sentence or a very short

19     sentence. The defendant was on probation when he committed the

20     second offense.

21             **THE COURT:**  Okay.

22             **MR. BUDLOW:**  The second offense involved the plea

23     and also a violation of probation.  Obviously the sentence

24     that he got was subject to parole. I do have that somewhere

25     and maybe the defense has it. My memory is that it was four

1    years of --

2           **THE COURT:**  That would cut out -- that would cut

3    down the temporal proximity because he wasn't in a position to

4    be engaged in the alleged predatory behavior.

5           **MR. BUDLOW:**  It was not a long sentence, for that

6    I'm fairly certain. I can figure out the number of years. He

7    then served time on probation. So in total it probably if you

8    include that probation time in the Court's analysis that's

9    going to add another five years. So 2006 was the conviction.

10   He would have been on probation at least five years and I'll

11   confirm this. That gets the Court to at least 2011. The

12   offense that's charged in Counts One and Two of the indictment

13   is 2015. So we're talking about four years proximate, a

14   temporal proximity there, well within all of the cases.  But

15   more importantly in terms of the arc of the defendant's life

16   as an adult, there's very little intervening time for which he

17   was apparently not communicating with minors and putting

18   himself around minors and exploiting minors.

19          **THE COURT:** Understood. Okay.

20          **MR. BUDLOW:**  And I will see what I can do to figure

21   out those dates if I can.

22          **THE COURT:**  Okay.

23      Ms. Francik?

24          **MS. FRANCIK:**  Thank you, Your Honor. Your Honor,

25   there as we noted in our motion and the Government noted in

1    its addendum or supplement, there are a number of sort of

2    rules of evidence, legal principles that bear upon the

3    admissibility of this evidence. Those are Rules 414, Rule

4    404(b), the principle of intrinsic versus extrinsic evidence,

5    and then of course also Rule 403. And Rule 403 applies

6    regardless of whether evidence may be intrinsic, whether it

7    may be admissible under Rule 404(b), or whether it may be

8    admissible under Rule 414. And so at the end of the day,

9    that's an analysis that always needs to occur.

10           We believe, Your Honor, that the Facebook chats and the

11   evidence of the prior offenses is not admissible either as

12   intrinsic evidence, as 404(b) evidence, or as 414 evidence.

13   But we also urge Your Honor to exclude that evidence under

14   Rule 403 because the probative value of that evidence is

15   substantially outweighed by a number of considerations, namely

16   the risk of unfair prejudice, a delay of wasted time, and of

17   juror confusion.

18           And so I had planned, Your Honor, to sort of break this

19   down into two -- organize this into two separate arguments:

20   The first relating to the Facebook chats; the second relating

21   to the prior offenses.  And so if the Court is fine with that,

22   that's how I'll proceed.

23                 **THE COURT:**  That's fine.

24                 **MS. FRANCIK:**  Your Honor, our position is that the

25   Facebook chats should be excluded first as extrinsic evidence.

1   They should be considered extrinsic evidence, evidence that is

2   not admissible under either Rule 414 or 404(b).  But also that

3   even if the Court finds that the Facebook chats are admissible

4   under either 414 or 404(b), this evidence should nevertheless

5   be excluded under 403.  And that's in this instance because

6   its limited probative value is outweighed by dangers of delay,

7   confusion, and wasted time.

8       First, Your Honor, we believe these chats represent

9   extrinsic evidence that is not necessary to complete the story

10  of any charged offense. The Fourth Circuit has defined

11  intrinsic acts as acts that are part of the single criminal

12  episode, acts that are necessary preliminaries to the crime

13  charged or that are necessary to provide context relevant to

14  the criminal charges, or in some way inextricably intertwined

15  with the criminal charges.

16      Here, Your Honor, the Facebook chats come into play

17  primarily in the context of Count 43.  That is a count that

18  charges Mr. Jones with distributing a pornography video over

19  Facebook. And to prove the elements of distribution, Your

20  Honor, the Government need not introduce any evidence about

21  either the recipients of the Facebook video, or even the

22  broader conversation wherein that video was sent. Because such

23  evidence in this case, under the particular circumstances of

24  this case, is irrelevant to the critical question. And that

25  is, who is it that sent that video?

1      We expect the Government to attempt to prove that it was

2   Mr. Jones who controlled the Facebook account and that he was

3   the person who sent the video using evidence that allegedly

4   links the Facebook account to Mr. Jones, including subscriber

5   information or information used to sign up for the Facebook

6   accounts and the contents of the account, like pictures and

7   innocent chats.

8      The content of the Facebook chats, the two Facebook

9   chats, Your Honor, that the Government seeks to admit here is

10  not necessary though or even especially probative to

11  establishing identity, to establishing that it was Mr. Jones

12  who sent that video.

13     While the full Facebook chat with the recipient of the

14  video who was charged in Count 43 may -- certainly it provides

15  some context, you know, for the video being sent, it doesn't

16  provide necessary context. And that is the question when we're

17  talking about whether evidence is intrinsic or extrinsic, is

18  it necessary or integral?  And here it just isn't.

19     As to the chat that the Government wants to introduce

20  with a person who said they were 15 years old, this person is

21  not a John Doe. It's not someone who was subject -- who is the

22  subject of any of the charged offenses. And so, of course,

23  that is not evidence that's in any way necessary, integral, or

24  inextricably intertwined with the charges.

25     We also believe, Your Honor, that the Facebook chats are

1    not particularly probative of the identity of the sender. We

2    disagree with the Government's characterization that those

3    chats essentially mirror the Instagram chats that underlie the

4    production counts in 1 through 27. And that's because there

5    are a lot of differences between the content of those chats,

6    Your Honor.

7        Apart from the Facebook chats involving people who

8    represented themselves as minors and discussing sending nude

9    pictures and videos, they don't entail offers of commercial

10   benefits, the same sort of offers that are featured in the

11   Instagram chats:  Offers of Instagram followers, of iPhones,

12   or other sorts of sort of commercial transactions. There's

13   nothing about the Facebook chats that suggests a commercial

14   transaction in the way that Instagram chats do. And that's I

15   think a very material distinction between the Instagram chats

16   and the Facebook chats.

17       The Government pointed to similar language in the chats.

18   You know, use of terms like "sexy," like "buttocks." I would

19   submit, Your Honor, that that language is just far too general

20   when we're talking about sort of sexualized chats. The use of

21   the term like "sexy" and "buttocks" really doesn't get to the

22   meat of whether those chats are so similar as to have -- to

23   make the Facebook chats have probative value with regards to

24   identity.

25       And so for this reason, Your Honor, we submit that the

1    content of the chats just simply is not strong evidence that

2    the identity of the Facebook sender and the Instagram user is

3    the same. And that if the jury finds that there's strong

4    enough evidence -- and if the jury finds that there's strong

5    enough evidence to believe that Mr. Jones is the Facebook --

6    or is the Instagram user, they must also find strong evidence

7    to believe that he was the Facebook sender.

8         **THE COURT:**  Is the -- do you know, do you know based

9    upon the discovery whether the Facebook recipient was under

10   age?  I know in the charges, present charges it's confirmed or

11   at least there's strong evidence that the kids were of a

12   certain age, 11 or 10 or 17 or 15 at the time that these

13   Instagram exchanges took place because you've got witnesses

14   and you've got folks coming in saying, "I was this old when

15   this happened" or that "It's me in this video." Is there any

16   evidence as to the ages of the individuals on the Facebook

17   pages who were allegedly being solicited by the defendant?

18        **MS. FRANCIK:**  So the chats themselves, Your Honor,

19   they do.  The Facebook, the recipients of the chats, the other

20   participant in the chat, in one they say that they are 15 and

21   that is the chat wherein the Facebook participant is not a

22   John Doe or the subject of any of these charged offenses. In

23   the other chat --

24        **THE COURT:**  How do you know that, though?  I mean, I

25   know that the Government is going to put on some evidence that

1    will corroborate the ages of the individuals who were on the

2    Instagram chats, but is there any corroboration of the

3    individuals' ages that were on the Facebook chats?  In other

4    words, could they have been just simply posing just like Mr.

5    Jones may have been or allegedly posing and therefore it may

6    not be as reliable as maybe some of the other Instagram chats

7    that I've already ruled would be admissible?  And so that's my

8    initial thought is like oh, okay, well how reliable is this

9    and could that go to the prejudicial aspect of this?

10           **MS. FRANCIK:**  Certainly, Your Honor. I would, I

11   think, turn to the Government to correct me if I'm misstating

12   any of this.

13           **THE COURT:**  Mr. Budlow will do that.

14           **MS. FRANCIK:**  I believe that both users were

15   believed to be in the Dominican Republic. I am not sure, I

16   believe that the Government sought to interview those users. I

17   am not sure whether or not they were located and, in fact,

18   interviewed. And that's not that that wasn't disclosed, it's

19   just my recollection is not perfect on that. And so --

20           **THE COURT:**  So the conversations you're suggesting

21   aren't detailed enough for them to be considered particularly

22   probative as to identity. The content isn't sufficient to be

23   able to have it probative or intrinsic to the charges at hand

24   because there's not necessarily -- the identity of the

25   recipient of the messages can't be really determined to point

1    to a definite comparison between the conversations that Mr.

2    Jones put in, allegedly put in for Instagram that are the

3    subject of counts in the indictment?

4         **MS. FRANCIK:**  I think that's right, Your Honor. I

5    think that there are a number of distinctions between the

6    content of the Facebook chats, the content of the Instagram

7    chats, first that don't sufficiently identify either

8    participant.  And I'm talking here about the content of the

9    chats themselves. And also, I mean, another distinction I

10   think between the Facebook chats and --

11        **THE COURT:**  I apologize.  Were those chats put in

12   any -- do I see those chats?

13        **MR. BUDLOW:**  I did not attach them. I do have copies

14   if you'd like me to submit them.

15        **THE COURT:**  I think that that would be helpful

16   because the challenge is is that the chats themselves aren't

17   that probative and I don't -- and I don't have -- I have not

18   read the chats to be able to make that determination. I don't

19   know how lengthy it is, whether or not there's something you

20   want to point out to me or we can defer that to another -- is

21   that something that you're going to use in your opening, Mr.

22   Budlow?

23        **MR. BUDLOW:**  It is not something I'm going to use in

24   my opening.

25        **THE COURT:**  Then I'm wondering whether or not I take

1    a look -- I just reserve on that argument and I will let you

2    complete your argument and then reserve on it.  And then I can

3    rule at some point in time when the presentation is made so I

4    can weigh everything out.

5              **MS. FRANCIK:**  Okay.

6              **THE COURT:**  That might be better.

7              **MS. FRANCIK:**  Yes, Your Honor, yes. I think having

8    an opportunity to actually take a look at the content of chats

9    and sort of weigh them against the accusations with respect to

10   the Instagram conversations is perfectly apt, given the basis

11   of our argument here.

12        And so Your Honor, we submit that the Court will find

13   that there just simply are too many distinctions, that they

14   are not especially probative. But that what they are and what

15   they would do is waste time and potentially lead to juror

16   confusion. And for that reason, they should be excluded under

17   Rule 403.

18        We certainly appreciate the Government's willingness, I

19   think Mr. Budlow spoke about this a bit earlier today. We

20   raised it in our letter to the Court and I think briefly

21   mentioned it when we met on Tuesday. The Government had

22   initially moved to admit a host of evidence of alleged

23   instances that were not specified in the production counts.

24   And after extensive conversations with the Government, I think

25   we've reached general agreements right now as to what the

1      Government may admit.

2          But it remains, Your Honor, that given the number of

3      charges in this case, the number of witnesses in this case,

4      the nature of the evidence of this case, it's a large case.

5      It's the sort of case that's going to require jurors to keep

6      track of dozens of counts, to listen to and keep track of over

7      a dozen witnesses. And so we submit that introducing these

8      Facebook chats is going to complicate an already complicated

9      task for these jurors. And it would lengthen the trial

10     certainly. It may also confuse the jury.

11         And so on balance, Your Honor, we do think that the

12     probative value of these chats is substantially outweighed by

13     those risks and they're risks that would be avoided if the

14     chats were simply excluded.

15                 **THE COURT:**  Okay, yes. Go ahead, Mr. Budlow.

16         Oh, I'm sorry, Ms. Francik, had you finished on that

17     issue?

18                 **MS. FRANCIK:**  If I could have one moment. Court's

19     indulgence.

20                 **THE COURT:**  I'm already deferring ruling on the

21     Facebook chats, so I was going to have you reply on that

22     aspect of it.

23                 **MR. BUDLOW:**  Oh, okay. Do you mind then?

24                 **MS. FRANCIK:**  No.

25                 **MR. BUDLOW:**  Thank you, Your Honor. Then I think

1    that Ms. Francik still is going to make additional argument

2    relating to the prior convictions.

3           **THE COURT:**  Right.

4           **MR. BUDLOW:**  And I actually have some more details

5    about that, but I can certainly wait.

6        Your Honor, I want to start with the last thing that Ms.

7    Francik said and I appreciate the opportunity to provide my

8    rebuttal. I have no problem with the Court holding this.  I'm

9    not planning on mentioning it in opening and then maybe the

10   Court won't need to hear argument down the road again, but if

11   you do, that's fine too.

12       So there's a lot of evidence in this case from Instagram

13   of lots and lots of counts. But that doesn't change anything

14   about the Government's evidence relating to the identity of

15   who did it. So we could have ten counts from Instagram, we

16   could have 100. Some would say there's too many already. I'm

17   glad we don't have 100. There could be, there's certainly that

18   many images. But that doesn't change the fact that the

19   Government's goal and object is to prove who did it in

20   Instagram. So that's the first point.

21       The Facebook account, the evidence that it is the

22   defendant's is very strong. His face is in the photographs.

23   There are a number of postings that are clearly from him.

24   There's a video of him talking where he identifies himself.

25   There's a video of him. So I don't know, I think the

1      Government's evidence that it's his Facebook account is

2      strong. And this is the point I think I made earlier certainly

3      in the briefs, it's his account which is exploiting these

4      minors.

5          And the one other point I want to make relates to the

6      Court's questions about the true age and the true identity of

7      the minors. And it's not irrelevant, but it really isn't the

8      point. The point is, what did the defendant believe?  Because

9      it's all about what his intent was. They could have been

10     undercover officers in Seattle, but if he believed that they

11     were 15 and a 17-year-old in the Dominican Republic, that's

12     the point here. It's still attempted production of child

13     pornography.  And it is as Ms. Francik said in the chats --

14     and I'll submit them after the hearing because I understand

15     the Court is going to take it under advisement, one is long,

16     50-something pages.  Not that we would necessarily need to

17     read or show all 50-something pages, the other one is much

18     shorter. One of the individuals says he's 17, one of them says

19     he's 15. The defendant's conduct, you know, it's not "Show me

20     your butt," it's "I want to see your ass." And that's what we

21     see, similar comments. He's very focused, the defendant, in

22     the Instagram chats with the victims that are the subject of

23     the indictment in a lot of things, but certainly he's very

24     focused on seeing the minors' buttocks and that he asked the

25     victims here.

```
 1              THE COURT:  And that's the terminology he uses
 2       during the course of these chats?
 3              MR. BUDLOW:  I don't know that the terminology is
 4       exact. And part of the reasons, these are interpreted chats.
 5       So this was in the Dominican Republic.  The defendant was
 6       using a --
 7              THE COURT:  A translating app.
 8              MR. BUDLOW:  A translating app and then they've been
 9       translated from Spanish back to English.
10              THE COURT:  Gotcha.
11              MR. BUDLOW:  So I'm not saying the language is the
12       same, but the translation isn't "buttocks," it's "ass."  And
13       he did say that. Court's indulgence.
14          I want to make a correction on the ages that I think I've
15       added to and I apologize if I did. The 17-year-old in these
16       chats is the defendant. The victims are 13 and 15. So again,
17       the victims are 13 and 15. ███████ says, "I'm 13." And
18       ████████ says, "I'm 15."
19              THE COURT:  Were there similar misrepresentations or
20       alleged misrepresentations regarding age in the Instagram
21       chats as well which would also create a similarity of the
22       grooming that was taking place?
23              MR. BUDLOW:  In the vast majority of the victims.
24       Not the victim that the defendant met in person and not his
25       friend.  So not John Does 2 and 3 and 4 who are the brothers,
```

1     but as to all of the other victims, there's some degree of

2     misrepresentation and always the defendant is a minor.

3             **THE COURT:**  Okay.

4             **MR. BUDLOW:**  17, 16.

5             **THE COURT:**  Right. And the defendant allegedly is

6     misrepresenting his age to appear younger than what he is.

7             **MR. BUDLOW:**  Yes.

8             **THE COURT:**  Similar to what --

9             **MR. BUDLOW:**  Yes.

10            **THE COURT:**  Similar to the Facebook exchanges.

11            **MR. BUDLOW:**  That's right.  And the one other

12    similarity at least as to one of these victims, he asks a

13    couple of times for the victim to show his face.  And that is

14    a similar request that the user of the Instagram accounts that

15    are the subject of the indictment makes. So he's asking to see

16    the face. The Government's view is he's doing that because

17    that's the leverage that he will get later.  Once he sees the

18    face and nudity, he can use that to leverage and extort

19    additional images. I mean, that's one of the reasons. He also

20    may just want to see their face, but that's a common request

21    that we see.

22        Let me just check. I don't believe I have additional

23    argument with respect to the Facebook chats, Your Honor. Thank

24    you.

25            **THE COURT:**  All right. What I'm going to do, I will

```
 1    await and if we could, I will await the Facebook chats and I
 2    will take them under advisement.  And then at the time of what
 3    is deemed appropriate, if the Government still intends on
 4    offering those then I will probably entertain a brief argument
 5    up at the bench. Ms. Francik will have the benefit of making
 6    another argument for it being cumulative or not probative and
 7    then Mr. Budlow can follow up with why it is not cumulative
 8    and that its probative value outweighs the prejudice.
 9         And we can probably mark it, it may be easier to mark it
10    as a Government exhibit for the purposes of this hearing so
11    that I can draw upon it immediately or hold it back. So I will
12    defer to you regarding getting that to the courtroom deputy.
13              MR. BUDLOW:  I can just complete the record now.
14    I'm going to mark them as M for motions 15.9.
15              THE CLERK:  15.9?
16              MR. BUDLOW:  Yes. And M 15.8.
17              THE COURT:  Okay, 15.8 and 15.9 and then you're
18    going to submit those, presumably you already have copies. I
19    will submit those and then I will take them in my materials
20    and take them -- take it under advisement.  And then upon --
21    it might be Wednesday.  I don't know whether it would possibly
22    come in, but whenever it comes in, a day before if you could
23    telegraph it "Hey, Judge, we're going to -- we're going to try
24    to get this Facebook posted here.  Why don't you take a
25    refresher course or why don't you take a refresher in the
```

1   materials."  And then I will be prepared to roll right into

2   making a decision after I entertain very brief argument from

3   the two of you.

4            **MS. FRANCIK:**  Thank you.

5            **THE COURT:**  All right.

6        The next is the -- next are the convictions. Ms. Francik,

7   you're up on that.

8            **MS. FRANCIK:**  Yes, Your Honor. Your Honor, we are

9   asking the Court to exclude evidence of those prior offenses

10  raised primarily on the dated nature of those offenses.

11  They're from 2004 and 2005. The convictions were entered in

12  2005 and 2006. But even if Your Honor finds that those prior

13  offenses do fall under Rule 414, we submit that evidence of

14  those offenses should be carefully limited to only the facts

15  that were proffered by the prosecutors during the guilty plea

16  hearings in Baltimore City Circuit Court. And that's for at

17  least two reasons, Your Honor.

18       First, we submit that any additional evidence, any

19  evidence outside the scope of the prosecutor's statement of

20  facts would be unreliable. That's especially true considering

21  the dated nature of those cases and the amount of time that's

22  passed since 2004 or 2005 and today.

23            **THE COURT:**  Have you concluded -- have you had

24  discussions with Mr. Budlow about whether or not there's an

25  intention to seek the admission of facts that go beyond what

1     has been put forth in the Alford plea?

2         **MS. FRANCIK:**  So in candor, no, Your Honor.  We

3     haven't really discussed sort of the details of what the

4     Government, if anything, would seek to introduce outside the

5     scope of the --

6         **THE COURT:**  Is the victim of those two particular

7     convictions intending on being -- are they going to testify as

8     to these acts?  Because presumably they would be allowed to

9     under 414. I don't know what is the -- what is your -- and

10     again, I don't want to have you telegraph anything that you

11     shouldn't.

12         **MR. BUDLOW:**  I don't mind.

13         **THE COURT:**  But how do you intend on -- what is the

14     scope of the evidence through 414 that you intend on putting

15     on?

16         **MR. BUDLOW:**  The Government's plan was after the --

17     assuming the Court ruled that it's admissible, would be to

18     seek a stipulation. There's been some preliminary discussions

19     about that. That's how I've done it in the past. Short of

20     that, there's other avenues.  Some would be certified records,

21     recordings of the Alford plea, and/or calling live witnesses.

22     My goal is to do it in as little time as possible and not by

23     agreement as to admissibility, but hopefully by agreement as

24     to the mode.  And that's just something that we'd work out

25     later.

```
 1          THE COURT:  Understood.
 2      All right, Ms. Francik, now that I've sort of gotten an
 3  idea of the vehicle by which this evidence would purportedly
 4  come in, you were -- and again, you were talking about really
 5  the temporal proximity and the nature is the reason why it
 6  should be at least limited.
 7          MS. FRANCIK:  That's right, Your Honor. And so
 8  exactly. So the reason why we believe that if it's allowed,
 9  again we submit that it shouldn't be admitted, but if the
10  Court rules that it can be admitted under Rule 414, that it
11  needs to be limited because A) anything outside the scope of
12  the prosecutor's statement of facts including live testimony
13  by witnesses in that case just simply wouldn't be reliable
14  given the amount of time that has passed since then. It would
15  create a burden on us and on Mr. Jones to need to relitigate,
16  to defend himself, and to essentially have a mini-trial in
17  cases that are at this point, almost two decades old.
18          THE COURT:  Isn't 414 designed for that?  I mean, in
19  some respects, I mean, it's broadened the scope. I mean, it's
20  got propensity.  And there's a statute which says yeah, the
21  Government under these circumstances is allowed to do that.
22  And so past conduct gets brought in and you've got to
23  relitigate some things I guess, right?
24          MS. FRANCIK:  So I certainly think that Rule 414
25  provides for something akin to a mini-trial in certain
```

1    instances, but that's only if the Court has assurance that

2    that mini-trial is going to involve reliable efforts.

3            **THE COURT:**  Gotcha.

4            **MS. FRANCIK:**  And so we believe, Your Honor, that

5    that's not the case here given the significant amount of time

6    that has passed.

7            **THE COURT:**  Would the reliability depend upon the

8    scope of the Government's evidence?  For example, Mr. Budlow

9    has suggested a proffer or putting into evidence the certified

10   records of conviction, or playing the audiotape of the Alford

11   plea, but not necessarily putting the actual victim on who is

12   the subject of the victim of the second degree sexual assault.

13           **MS. FRANCIK:**  I think that's right, Your Honor. I

14   think if the Court, again, finds that it is admissible under

15   414, it's still appropriate to narrowly tailor it only to the

16   statement of facts offered by the prosecutor, certified

17   records and then nothing further. And certainly not live

18   testimony or any other evidence that was neither stipulated

19   to, stipulated by Mr. Jones back in 2004, 2005. It was not

20   entered by the prosecution during the course of those guilty

21   pleas. It wasn't found by the Court during those guilty pleas.

22   I mean, the factual basis for the 2004, 2005 cases was

23   exclusively limited to the state prosecutor's proffer.  And

24   for that reason we would ask that if those offenses come in,

25   the factual -- the facts here should be exclusively limited to

1      the state prosecutor's proffer.

2            **THE COURT:**  Understood.

3            **MS. FRANCIK:**  And we believe that any additional

4      evidence, Your Honor, would present too great a danger of

5      prejudice because it would risk, again, that the jury is going

6      to be confused. They're going to hear about this stuff from 20

7      years ago. They're going to maybe hear from witnesses from

8      that long ago. And it would raise an improper and an undue

9      risk that they would infer or convict Mr. Jones based on these

10     dated offenses.

11           **THE COURT:**  Okay, thanks.

12         Anything additional you'd like to add, Mr. Budlow?

13           **MR. BUDLOW:**  Your Honor, I'd like to clarify the

14     timing issue because I was able to get my notes and I do want

15     to just make a brief response to the discussion of the sort of

16     mode of evidence if the Court rules it admissible.

17         But big picture first, I don't want to go through my

18     argument before -- I don't think we've heard anything that

19     makes the evidence sound unfair in any way other than the fact

20     that it's old.  And I don't believe that that meets the

21     standard.  So I think the Government's argument earlier as to

22     its relevance and admissibility under *Stamper* and 414 still

23     holds.

24         With respect to how the Government does it if we're

25     allowed to do it, the Government agrees that if we can reach a

 1    stipulation, it would be limited to what's in the proffer by

 2    the state at the Alford plea. We're not looking to have

 3    additional live witnesses in this long trial if we reach that

 4    agreement.  But if we do not, the defense is just -- and I

 5    don't want to go too deep into this because I think we'll get

 6    there, but the defense is wrong to say that we're limited to

 7    the conviction. The conviction is not required under 414.

 8            **THE COURT:**  Right, I understand. It's the conduct.

 9            **MR. BUDLOW:**  The conviction is what makes the

10    witness's testimony reliable.  Age or no age, he was found

11    guilty of their offenses and they would come in and be saying

12    "This is what happened to me by the defendant," presumably.

13    And, of course, the Court is the gatekeeper.  Their testimony

14    has to be reliable. If in the interim they suffered a head

15    injury and don't really have a memory, of course you would be

16    able to in your discretion, do what you got to do.  But I just

17    want to point out, the fact that there's a conviction maybe

18    makes it easier to determine reliability, but it's not a

19    critical fact in reaching that decision.

20            **THE COURT:**  You could have a very credible witness

21    who comes in and says, "He did this to me before and I didn't

22    report it" and that very well could be admissible if a

23    judicial gatekeeper found it to be reliable.

24            **MR. BUDLOW:**  Right. And I've had that in cases in

25    this courthouse.

1          THE COURT:  Right.

2          MR. BUDLOW:  So I do want to give the Court just the

3     sort of chronology of the defendant's convictions and various

4     court proceedings.

5          So the defendant was convicted in the 2004 case. The

6     guilt finding was on July 21st of 2004. His original sentence

7     was four years, suspend all but two months with two years

8     probation.

9          In 2006 he was convicted of violating that probation and

10    received a four-year sentence. And now, of course, the

11    violation was based on the second incident where the defendant

12    was convicted of second degree sex offense.

13         The incident occurred in August of 2005, according to the

14    indictment. The defendant received a sentence -- I'm looking

15    for the date of the original sentence -- of January 5, 2006

16    and received a sentence of -- and I misspoke earlier,

17    significantly.  20 years suspend all but seven years followed

18    by supervised probation.

19         Regardless of the seven-year sentence, he did receive a

20    violation of probation in 2010.  So clearly he was released

21    sometime before 2010, was on supervised probation and received

22    a violation. He was also violated in the same case on August

23    the 7th of 2015. And Your Honor, that is the same summer as

24    the incident involving John Doe 1, but that was before the

25    defendant was arrested in Baltimore City relating to John Doe

1  1.  So that violation is not related to his arrest for the

2  abuse of John Doe 1.

3          **THE COURT:**  Understood.

4          **MR. BUDLOW:**  Then again, we know he awaited time in

5  detention for that case and was released I believe in 2016,

6  late 2016 because at the end of the year he registered with

7  the Sex Offender Registry Unit. In January of 2017 he violated

8  his probation and his probation was continued.

9      So he was clearly under court supervision at least

10  through January of 2017.  And the indictment in this case

11  contains offenses.  The first production offense that doesn't

12  include John Doe 1 is March of 2019, but the allegations in

13  counts -- in Count 28 discusses a coercion and enticement

14  offense relating to John Doe 2 in September of 2018.

15      So, you know, this is just uninterrupted child sex abuse.

16  There's no -- the temporal proximity is obvious. There's no

17  break in the defendant's offending.

18          **THE COURT:**  Right, okay.

19      Ms. Francik, anything additional to add?

20          **MS. FRANCIK:**  If I could have one moment, Your

21  Honor.

22          **THE COURT:**  Yes.

23          **MS. FRANCIK:**  Nothing further.

24          **THE COURT:**  Pending before the Court is a motion to

25  admit two previous convictions under Rule 414, similar crimes

1    in child molestation cases. The rule does indeed provide for

2    evidence in a criminal case that the defendant who is accused

3    of child molestation may, the Government may admit evidence

4    that the defendant committed any other child molestation. The

5    evidence may be considered on any matter to which it is

6    relevant.

7         In the present case, the evidence of the prior

8    convictions is being offered for the purposes of showing the

9    defendant has a propensity to engage in this kind of behavior.

10   There are a number of factors that the Court considers,

11   including a balancing test under Rule 403 which the Court

12   always considers.

13        Looking at the similarity between the previous offense

14   and the crimes that are being charged, there is certainly a

15   similarity between the previous convictions, the ages of the

16   conviction -- the ages of the victims, the kinds of sex

17   offenses that were in both the cases.  The temporal proximity

18   between the two cases and crimes is there. The defendant was

19   serving a sentence either on parole or probation or supervised

20   -- supervision in fairly close proximity to the time that he

21   engaged in the acts in the present case within a few years.

22   Although the convictions themselves may be somewhat dated,

23   they are well within the time frame that has been recognized

24   by the Court as creating a temporal proximity.

25        As far as the frequency of the prior acts, well there are

1   two prior acts. There are no intervening circumstances or an

2   absence -- there isn't an absence of any intervening

3   circumstance which would make the particular evidence

4   irrelevant or not probative. And, of course, the evidence is

5   reliable. These are convictions.  And although they did not

6   arise out of an actual guilty plea or an admission of guilt by

7   the defendant, the defendant did, indeed, admit that there was

8   sufficient evidence that he be convicted.

9       I do agree with Ms. Francik that the scope of the

10   evidence should be very narrow because I would have to make my

11   own independent determination as to the reliability of the

12   evidence that would be presented to any evidence outside of

13   that scope. I do believe that it is extremely probative of the

14   offenses charged.  And when I weigh the probative value versus

15   any prejudice, I find that the probative value clearly

16   outweighs any prejudice that the defendant would suffer.

17       The rule itself is designed with a presumption of

18   admissibility of these prior acts and I as the judge am the

19   gatekeeper of what is reliable, relevant evidence that should

20   be admitted.

21       So I'm going to go ahead and admit the evidence of the

22   prior child molestation facts and circumstances and that would

23   include the convictions.

24       Is there anything else related to this motions hearing

25   that we can handle productively?  And I will pass down on

```
 1        Monday the bullet points related to the voir dire. I modified

 2        those as we discussed previously.

 3             Ms. Francik, is there anything else?

 4             MS. FRANCIK:  Just very briefly, Your Honor.

 5             THE COURT:  Yeah.

 6             MS. FRANCIK:  I would like to make a very brief

 7        record and sort of inform the Court of the defense's plan

 8        moving forward with respect to any additional objections. As

 9        Your Honor is aware, the Government did file in its initial

10        motion a request to admit instances -- additional instances of

11        conduct with respect to John Does 2 through 16.

12             As we have alluded to if not discussed, there has been

13        extensive discussion with the Government about what, if any,

14        of those instances, or which of those instances and evidence

15        they will admit. I think those were very productive

16        discussions and we have reached general agreements as to the

17        evidence the Government will seek to admit.

18             But I do want to make the Court aware of the fact that to

19        the extent any objections arise during the course of the

20        trial, as the Court spoke about earlier during the flow of

21        evidence and sort of the experience of the evidence being

22        introduced, there may be additional objections that arise

23        during the course of the trial.

24             THE COURT:  Well, you know, I have the utmost

25        respect for the Public Defender's Office and defense counsel.
```

```
 1    I have no doubt that any objections that will be made will be
 2    based in the law or the facts and made in good faith, so
 3    that's perfectly fine. And often it is the case there
 4    sometimes could be just truly good faith misunderstandings
 5    about how the evidence was going to play out. And it may be
 6    something came up that was unexpected, the way the evidence
 7    was presented and reasonable interpretation could go one way
 8    or the other. So I certainly would not come down on you or
 9    prevent you from exercising your right to object to evidence
10    where your understanding of the terms of its admission or the
11    scope of the evidence is different from what was contemplated
12    by the Government.
13            MS. FRANCIK:  Thank you, Your Honor.
14            THE COURT:  All right.
15            MR. BUDLOW:  Your Honor, that actually reminded me
16    of a couple administrative or housekeeping matters.  Do you
17    have time to bring that --
18            THE COURT:  I do, and I've got a couple of my own.
19            MR. BUDLOW:  Do you want to go first or do you want
20    me to go first?
21            THE COURT:  You can go first.  That's fine.
22            MR. BUDLOW:  Okay, great. I wanted to make the Court
23    aware, we told defense counsel this, the presentation of
24    evidence in this case relating to the sort of marrying up if
25    you will of the Instagram chats as I explained that we got
```

1    from search warrants of Instagram and the iCloud images is

2    going to be a little bit time consuming depending on the

3    victim, depending on how long the relationship was. Sometimes

4    it will be short. But what it involves is both the sort of

5    displaying of videos that are from iCloud that are often child

6    pornography but not all, and the reading of chats that went

7    back and forth between the John Does and the user of the

8    Instagram account the Government contends is the defendant. We

9    don't plan on doing those -- first of all, the defense was

10   alluding to this.  There's a significant amount of chats for

11   some.  Even for the ones where there's 800 pages, we've done

12   our best to narrow it down significantly. The defense is aware

13   of exactly what the Government plans to introduce to the jury

14   in terms of those chats. Those chats are anywhere from 3 to 35

15   pages of back and forth between the two users.

16        We're not planning on showing that evidence to the

17   victims. The victims are going to come in and testify to a

18   much simpler version of who they are, what their age is,

19   identify various things. We're going to put in much of that

20   evidence through the case agent.

21        The plan that I have would be to -- and it's a little bit

22   unconventional, but I have heard of it in similar cases which

23   is to literally have two individuals in the courtroom in the

24   well of the courtroom who are not sworn witnesses, but who are

25   readers. The case agent, Agent Corn, would be testifying to

1    having obtained the Instagram records and the iCloud records.

2    It will be a significant amount of background. When we get to

3    the portion where we would do -- let's say typically we would

4    play an audio or play a video or do a read back between

5    sometimes the attorney and the witness, the Government

6    believes it makes far more sense in this case to have the two

7    individuals read the chats and stopping at appropriate times

8    to allow us to play a video or have testimony related to these

9    chats if there was a file exchange. The plan would be to have

10   somewhat consistency, meaning the witness or the reader, one

11   reader is the Instagram account and one reader is the John Doe

12   account. There are 13 maybe, maybe a little bit less exhibits

13   of John Doe chats.  So even though there's 16 John Doe chats,

14   there aren't 16 sets of exhibit like that. Some had brothers,

15   John Doe 1 was not involved, some of them there's actually no

16   chats.  So there's about 13. That's the first thing. That's

17   our plan is to put two readers in the well of the courtroom.

18   Obviously nothing theatrical about the reading.  None of them

19   will be dressed up.  They'll be wearing their street clothes

20   and again, I don't think there's any reason to have them

21   sworn.

22       I've done something similar in a case two years ago in

23   front of Judge Hollander where actually Aaron Zelinsky, who is

24   an AUSA, was one of the readers. I'm not even sure if we even

25   identified him by name. And so he actually has volunteered and

 1   the Government will -- probably he'll be one of the readers as

 2   well if his schedule stays clear.

 3       In a perfect world we'd have the same two people

 4   throughout the trial. It might be spread out over a few days,

 5   so I'm not so sure if that would be the case but that's our

 6   goal.

 7           **THE COURT:**  So I would likely with, of course, the

 8   defense's consent, advise the jury about the pure role of

 9   these two people that are reading and that they should not

10   provide their words with anymore credibility because they're

11   being read in open court. It's just simply for the matter of

12   the presentation of the evidence. And they should ignore any

13   tone or flux, any change in tone or speech pattern or anything

14   like that that should not be imputed to the defendant. It's

15   just a pure read. It's like you read it into the record and

16   you have Siri reading it out or something. So, okay.

17           **MS. FRANCIK:**  If I could have one moment, Your

18   Honor.

19           **THE COURT:**  Yes.

20           **(Discussion held off the record.)**

21           **THE COURT:**  Yes.

22           **MS. FRANCIK:**  Yes, Your Honor.  We just wanted to

23   make a record.  We certainly take the Government on their word

24   that the readers will read as matter of factly and as

25   untheatrically as possible. We do have some concern about that

1    and so we just want to make sure that there is nothing about

2    this reading that would in any way suggest anything more than

3    the content of these chats either by the appearance of the

4    readers, the intonation or tone they take while reading it.

5    And so we'd ask that --

6         **THE COURT:**  In a perfect world why don't you get

7    somebody from the Public Defender's Office to read it that's

8    unidentified and somebody from the U.S. Attorney's Office to

9    read it?  They're not going to be identified. And that's your

10   quality control. I mean, I know you typically wouldn't want

11   that, you know, but I don't know -- you know, I'm just saying

12   if you're concerned about quality control and you just want it

13   read, without -- in an unemotional fashion, then I don't see

14   any -- and it can be anybody off the street. It would be, you

15   know, it would be an intern or whoever that's going to do

16   this, then that's one assurance, quality control, instead of

17   having a federal prosecutor read -- two federal prosecutors

18   read it back and forth and you saying "Geez, I hope that they

19   don't do anything."

20        **MR. BUDLOW:**  If there's a problem they'll tell us.

21   This is not -- I don't know that this is a real issue.

22        **THE COURT:**  I don't think so either.

23        **MR. BUDLOW:**  In the normal circumstance it would be

24   me and the agent.  I've never accused of being theatrical in

25   that context.

1          THE COURT:  I promise you, I will -- if that were to

2     happen, and I don't believe that it would happen, I would

3     absolutely admonish the jury to ignore the tone and tenor and

4     specific of it. So I don't think that that's going to happen.

5          MS. FRANCIK:  Understood, thank you.

6          THE COURT:  All right. Second thing.

7          MR. BUDLOW:  We mentioned sequestration of witnesses

8     yesterday. I should have mentioned this. Obviously we have a

9     case agent that doesn't apply.  I just wanted to make sure

10     that's on the record.

11          THE COURT:  Of course.

12          MR. BUDLOW:  And then the last issue which the

13     defense counsel is aware of, the Government's plan is what

14     I've done in many cases, which is because I think it makes

15     sense to explain the evidence, is to call Agent Corn twice;

16     once towards the beginning of the case and then once towards

17     the end of the case. There's a lot of rationals, but one of

18     which is a lot of evidence that Agent Corn will be discussing

19     at the end of the case won't even be referenced and it relates

20     to digital evidence that hadn't been seized and examined yet.

21     It doesn't fully break down that way, but I don't believe the

22     defense objects.  I just wanted the Court to be aware of that.

23          THE COURT:  All right, noted. As long as it's not

24     duplicative, it seems to me that I handle the flow of evidence

25     in the case and to do things most efficiently. So it seems to

1    make sense to me.

2         Now, my issues.  We have got an uptick in COVID, but I

3    don't want to spook anyone either. I'm fully vaccinated, and I

4    have no issues.  But one of the things that I am concerned

5    about to be perfectly candid, is when we are up close here in

6    voir dire or bench conferences and especially during jury

7    selection when we've got 70-something or 60-something

8    strangers coming up unmasked, I intend on wearing a mask.  And

9    I'm going to leave it discretionary to the members of the

10   public as to whether or not they want to wear a mask. And not

11   that I personally have any susceptibility, but I have exposure

12   to individuals who might be particularly susceptible. So if

13   you want to make me feel good you can wear a mask too, but if

14   you don't, I get it. But I am going to have one on especially

15   when we're up close, personal, leaning on each other.  But

16   during presentations and arguments, I'm not going to require

17   masks. I may end up asking you if we come up for bench

18   conferences to put one on. I will telegraph that to the jury.

19   I will let them know that masking is optional, that I've

20   chosen to wear a mask when we're up close and personal here,

21   but when we're in the courtroom it's no requirement.  But

22   don't feel stigmatized if you decide you want to put your mask

23   on because there is -- there's a -- I see Mr. Jones has a mask

24   on.

25         And I will note, Mr. Jones, when you're identified during

 1   jury selection you're going to have to, if you have the mask

 2   on, you're going to have to pull it down to show the members,

 3   ladies and gentlemen of the jury, your face. And, right. So

 4   that's that.

 5        So that was the big issue. I'm not going to ask

 6   vaccination questions of the jury. I think we're beyond that

 7   circumstance and I am going to have three alternate jurors

 8   that we'll have to choose from and I think that that's it. I

 9   don't have anything else. If something comes up, I am

10   available.  If for some reason we have some sort of pretrial

11   resolution in this case, let me chambers know as soon as

12   possible, but if not I will be fully intending on getting

13   started, everyone will report here at 9:00 tomorrow morning --

14   Monday morning and we will get this jury picked.

15        We're not going to take testimony on Monday, just to make

16   perfectly clear. We'll start out with openings on Tuesday.

17   Don't forget Tuesday I'm going to adjourn at 11:00.  I've got

18   a Zoom thing.  So from 11 to 2 on Tuesday there won't be any

19   court proceedings. And then Thursday we're ending at noon and

20   then the holiday is the following Monday, the 25th. So we

21   won't be seated -- on --

22             **MR. BUDLOW:**  Two Mondays.

23             **THE COURT:**  Two Mondays, two Mondays, I apologize.

24   I want to make sure we're on the same page.

25        Is there anything else?

1          **MS. FRANCIK:**  Nothing further.

2          **MS. NEWBERGER:**  Your Honor, can I just make one

3    suggestion in light of the Court's COVID concerns?  I picked a

4    jury in May with Judge Bredar and one of the things he did so

5    we were not all grouped up at the bench was instead of having

6    all of the jurors in the gallery when the individual

7    questioning happened, they were outside of the courtroom.  And

8    he called in people one by one.  They sat in the jury box.  We

9    sat at counsel table and that prevented everyone from being in

10   close proximity right there. So just food for thought for Your

11   Honor.

12         **THE COURT:**  So in other words, they're lining up

13   outside of the court, they're brought in one at a time,

14   they're sitting at the jury -- in the jury box.  You ask them

15   -- and then we ask them the individual voir dire questions. Of

16   course we're going to start with the hardship and the cause

17   questions first.  So maybe if somebody answers the

18   impossibility to serve question they're just going to be up

19   and out and we'll call the next person in. You know, yeah.  I

20   mean, what do you think?

21         **THE CLERK:** No.

22         **THE COURT:**  You got vetoed.  We'll do it this way

23   because -- and if we're masked, that's fine, if you're

24   comfortable with that. I think it can be much more fluid that

25   way and we can get this jury picked pretty quickly doing it

1    that way. So, I mean, nice suggestion, but you got vetoed.

2              **MS. NEWBERGER:**  I understand.

3              **THE COURT:** All right, is there anything else?

4              **MR. BUDLOW:**  Not from the Government, Your Honor.

5              **THE COURT:**  All right, see you on Monday. Thanks

6    again.

7                   **(Proceeding concluded at 4:23 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, Nadine M. Bachmann, Certified Realtime Reporter

6    and Registered Merit Reporter, in and for the United States

7    District Court for the District of Maryland, do hereby

8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

9    true and correct transcript of the stenographically-reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the regulations

12   of the Judicial Conference of the United States.

13

14                          Dated this <u>9th</u> day of <u>November, 2023</u>.

15

16                          *-S-*

17                          _____

18                          NADINE M. BACHMANN, CRR, RMR
                            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25